Phillip E. NAUGLE, Cheryl Susanne Naugle, and Search Investigation, Inc., a Utah corporation, Plaintiffs,

v.

Doug WITNEY, in his individual capacity and as a Deputy Utah County Sheriff, Orem City, a municipal corporation, Utah County, a body politic, David R. Bateman, in his individual capacity and as Utah County Sheriff, Owen Quarnberg, in his individual capacity and as a Deputy Utah County Sheriff, Ted Peacock, Orem City Police Chief, Doug Edwards, in his individual capacity and as

an Orem City Police Officer, John L. Allan, in his individual capacity and as a Deputy Utah County Attorney, Craig R. Madsen, in his individual capacity and as a Deputy Utah County Attorney, Steven Killpack, in his individual capacity and as Utah County Attorney, and John Does 1-30, Defendants.

Civ. No. 89-C-372W.

United States District Court, D. Utah, C.D.

Dec. 31, 1990.

1506

Ross C. Anderson, Timothy W. Miller, Salt Lake City, Utah, for plaintiffs.

Anne Swensen, Salt Lake City, Utah, for defendants Ted Peacock, Doug Edwards and Orem City.

Dale J. Lambert, Wesley M. Lang, Salt Lake City, Utah, for defendants Doug Witney, Owen Quarnberg, John L. Allan and Craig R. Madsen.

Guy Burningham, Utah County Atty., Provo, Utah, for defendants David R. Bateman, Steven Killpack and Utah County.

## MEMORANDUM DECISION AND ORDER

WINDER, District Judge.

This matter is before the court on cross-motions for summary judgment. A hearing on the motions was held September 27, 1990. Plaintiffs were represented by Ross C. Anderson and Timothy W. Miller. Defendants Doug Witney, Owen Quarnberg, John Allan and Craig Madsen were represented by Guy Burningham, Dale J. Lambert and Wesley M. Lang. Before the hearing, the court considered carefully the memoranda and other materials submitted by the parties in relation to the motions. Since taking the matter under advisement, the court has further considered the law and facts relating to this motion. Now being fully advised, the court renders the following memorandum decision and order.

### BACKGROUND

This case stems from the February 2, 1989 search of plaintiffs Phillip and Cheryl Naugle's home and office by officers of the Utah County Sheriff's Office ("Sheriff's Office"). Because of the issues involved, a detailed recitation of the events leading up to the search and the circumstances surrounding it is necessary.

### A. *The Investigation*

In late 1988, the Sheriff's Office began an investigation into the activities of Phillip and Cheryl Naugle, and their business, Search Investigation, Inc. ("SII"). SII is a private investigation business organized by the Naugles in 1983. The Naugles are the sole owners of SII and they run the business out of their home in Orem, Utah. During the week of January 23, 1989, Doug Witney, a Sheriff's Office detective, was assigned to the investigation. During the course of the investigation, Witney met with at least four individuals—Jim Johnson, Michael Borjessen, David Barksdale and Kirk Myers—who claimed to have worked for SII at the direction of Phillip Naugle. These individuals provided information linking Phillip Naugle and SII to criminal activity.

#### 1. The Informants

Johnson told Witney that Naugle was using letterhead from the Utah County Constable's Office to further SII's business interests. Johnson provided Owen Quarnberg, a Sheriff's Office captain, with original letters drafted on the Constable letterhead. Witney later was informed by a United States Postal Service official that Phillip Naugle had identified himself as a Utah County Constable while conducting business at the post office. Johnson told Witney he tried to set up wiretaps at Phillip Naugle's direction. Johnson also told of occasions when he had been ordered to trespass and photograph inside people's homes.

At the time he was an agent for SII, Borjessen also was a Deputy Utah County Constable. Borjessen told Witney that on one occasion he called Phillip Naugle's office number and Cheryl Naugle answered the phone saying, "Constable Borjessen's office" and then Phillip Naugle answered the phone, identifying himself as Mr. Borjessen, Deputy County Constable.

Informant Barksdale told Witney of a 1985 case in which Phillip Naugle allegedly directed the kidnapping of children in Arizona for a non-custodial parent who was a client of SII. Barksdale told Witney that

Phillip Naugle had instructed him to purchase handcuffs, mace and a nightstick for use in the job. Witney later confirmed that SII had billed the client for the nightstick, mace and handcuffs.

On January 31, 1989, Witney met with informant Myers, who showed Witney files he had kept of his activities while employed at SII. Myers identified three specific cases in which Phillip Naugle allegedly directed illegal wiretapping: the Lynn Neilson, Richard Lichtenfels and Maretta Anderson cases. Myers also told Witney of various other allegedly illegal activity, including an incident where he was directed to threaten an individual in order to get payment for a client.

### 2. The Garbage Search

In an effort to obtain evidence corroborating the informants' information, Witney and other officers searched the Naugles' garbage in front of their house on the public right-of-way. During the search, officers located a letter addressed to the "Utah County Constable, Search Investigations Division" and letters drafted on Utah County Constable letterhead. The officers also found what appeared to be an income tax form in the garbage purporting to report income to certain agents, including approximately $4,000 to Myers for 1988. Myers told Witney that he did not earn $4,000 from SII during that year. He later provided Witney records supporting that statement.

### B. The Affidavit

Based on information received from the informants and other witnesses, evidence gathered during the garbage search, and on review of certain documents, Witney drafted an Affidavit in Support of Search Warrant ("Affidavit"). On February 1, 1989, Witney took the Affidavit to Deputy County Attorney John L. Allan for review. Allan and Witney then took the affidavit to Craig Madsen, Chief of the Criminal Prosecution Division, for review. Allan and Madsen approved the Affidavit with some recommended changes, which were incorporated.

The Affidavit consists of thirteen paragraphs. Paragraphs two through nine re-cite evidence of Naugle's and SII's criminal activity that the Sheriff's Office had gathered from the confidential informants and other witnesses. Paragraph eleven of the Affidavit reads as follows:

11. Due to the scope of Search Investigations illegal business activities a search is requested for any and all business forms and or documents inscribed, printed, or copied upon with the Utah County Constable insignia or office title, and recordings or player, any surveillance equipment, photographs, telephone records or equipment, personnel files, payroll records, business records, contracts, computer equipment, tube cameras, both hard and software, radios, scanners, cameras, video equipment, and any other articles used in the support or furtherance of illegal activity.

Affidavit ¶ 11. During their review of the Affidavit, Allan and Madsen agreed that the request for business records in ¶ 11 was as particular as reasonably possible under the circumstances.

### C. The Probable Cause Presentation and Issuance of the Warrant

On February 1, 1990, Witney presented the Affidavit to the Honorable Lynn Davis, a Judge of the Fourth Circuit of Utah County, and requested that Judge Davis issue a Search Warrant ("Warrant") for plaintiff's home and office. On that date, Witney presented additional testimony to Judge Davis in support of the Warrant.

Witney testified regarding (1) the recovery from the Naugles' garbage of stationery bearing the Utah County Constable logo; (2) an informant's use of a "tube camera" in the surveillance of individuals engaged in sex (Witney learned after the search that the informant never carried out the assignment); (3) the use of cameras to photograph houses where illegal wiretapping had allegedly taken place; (4) the alleged involvement of SII and Phillip Naugle in the 1985 kidnapping in Arizona and the belief that evidence of that involvement might be found in plaintiff's personnel and business records; and (5) evidence of falsification of payroll records. Witney's testi-

mony regarding the allegedly false payroll records was received after Judge Davis signed the Warrant.

Witney did not inform Judge Davis on the record that he had information suggesting SII was an "ongoing criminal enterprise" or "racketeering enterprise." Witney did tell Judge Davis off the record, however, that he had concluded that SII was permeated with criminal activity.

At the conclusion of Witney's testimony, Judge Davis issued the Warrant, which authorized search and seizure of the following items:

> Letters, papers, documents, checks or envelopes inscribed or printed upon with the Utah County Constable, the Utah County Constable Star, or any such insignia which gives the appearance or represents a government agency, or anything else that in its nature could be used to imply an affiliation with such an agency, any surveillance equipment including electronic listening and recording devices, cameras, binoculars, radios, telephone hardware and records, business records, personnel files, payroll records, computer, both hard and software, contracts, tapes or video equipment, and any other articles used in the support or furtherance of.

Warrant at 2.

The final clause in the above-cited portion of the Warrant does not have an object. Although neither Allan nor Madsen reviewed the Warrant before it was obtained, Allan expected the Warrant to follow the Affidavit. Madsen expected the Warrant to be similar to the Affidavit. After Judge Davis signed the Warrant, Witney advised the judge that some of SII's records relating to possible tax fraud were stored on computers.

### D. *The Stop*

On the morning of February 2, 1989, Witney and Quarnberg, along with Doug Edwards, an Orem City police officer, decided to initiate a traffic stop of Phillip Naugle if he left his residence that morning. Officer Newren of the Orem City Police Department was assigned the task of assisting Edwards in initiating the traffic stop. The purpose of the stop was to inform Phillip Naugle of the Warrant and to request his cooperation in overcoming potential problems with an electric fence, surveillance system and guard dogs on the Naugle property.

At approximately 9:15 a.m., shortly after Phillip Naugle drove away from his home, Officers Newren and Edwards pursued Naugle in a marked Orem City police car. Quarnberg, who was driving a vehicle directly behind Newren and Edwards, also pursued Naugle. Newren and Edwards turned on the overhead lights of their squad car and initiated the stop of Naugle. Immediately following the stop, Edwards approached the Naugle vehicle and informed Naugle of the Warrant. Edwards gave Naugle a copy of the Warrant, and asked if Naugle would accompany the officers to the residence to assist in gaining entry to the Naugle property. Both Edwards and Quarnberg informed Naugle that he was not under arrest.

During the stop of Naugle, Quarnberg requested that Naugle turn over a handgun that Naugle carried on his person. Naugle complied with this request. Shortly thereafter, Naugle, accompanied by Edwards, drove back to his residence.

### E. *The Search*

Upon arrival at the Naugle residence, Witney, Quarnberg and other officers of the Sheriff's Office executed the Warrant. Quarnberg supervised the search and looked at certain items of the Naugles' property as such items were brought to his attention. Often during the search, Quarnberg advised other officers whether particular items fell within the confines of the Warrant.

Allan and Madsen accompanied the officers to offer legal advice. On several occasions during the search, officers approached Allan and Madsen and asked them whether particular items fell within the scope of the Warrant.

In response to these queries, Allan inspected files, looked at a pamphlet, examined a file cabinet that contained family albums and a dog training file, looked in-

side a closet that contained electronic equipment and looked at several guns. Madsen, who participated in the search for about one hour, looked into a closet, examined letterhead, guns and computer equipment and advised officers as to whether those items were described in the warrant or had evidentiary value.

After examining numerous files and file cabinets, Witney, Quarnberg and Allan determined that most of the files were business files and that most of the business files contained documents inscribed with the Utah County Constable insignia. Based on these determinations, Witney, Quarnberg and Allan decided to seize whole filing cabinets, which were transported to the Sheriff's Office for further search. Officers eventually seized six filing cabinets, numerous pieces of camera equipment, computer hardware and software, card files and a Rolodex.

Also seized were several items contained inside the filing cabinets and other containers that defendants concede clearly were not within the scope of the Warrant. These items included family picture albums, genealogy records, an odd shaped marble rock, an artificial flower, a cordless weed trimmer charger, a soldering iron, a tire pressure gauge, a putty knife, small screwdrivers, other tools, books, booklets, a high school newspaper, magazines, a money corsage and picture frames. In total, officers seized at least 220 such items, which were separated and later returned to the Naugles.

During the search of the Naugles' home and office, Phillip Naugle made a telephone call to his attorney, Brent Young, who then conversed with Allan regarding the search. According to Young, Allan conceded during the conversation that defendants were trying to put Naugle out of business. Defendants dispute this version of the conversation. Shortly after the conversation, the Naugles were told they were free to leave the premises.

**1.** The summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

## STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). In applying this standard, the court must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Applied Genetics Int'l v. First Affiliated Securities,* 912 F.2d 1238, 1241 (10th Cir.1990).

Once the moving party has carried its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Abercrombie v. City of Catoosa,* 896 F.2d 1228, 1230 (10th Cir.1990).[1] The nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Lujan v. National Wildlife Fed'n,* — U.S. ——, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990) (quoting *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552).

In considering a summary judgment motion, this court does not weigh the evidence but instead inquires whether a reasonable jury, faced with the evidence presented, could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).[2] Finally, all material facts asserted by the moving party shall be deemed admitted unless specifically controverted by the opposing party. U.S.Ct.D.Utah Civ.R.P. 5(e).

**2.** "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

## DISCUSSION

Plaintiffs request summary judgment on their first and fourth claims for relief, which seek, respectively, damages for alleged violations of plaintiffs' fourth amendment rights pursuant to 42 U.S.C. § 1983 and damages for such violations directly under the fourth amendment. Plaintiffs claim their fourth amendment rights were violated because their premises were searched pursuant to a facially overbroad search warrant that was not supported by probable cause.

Plaintiffs further claim they were subjected to an unreasonable seizure of their property because officers seized items not described in the facially overbroad Warrant. Finally, plaintiffs claim that, as a matter of law, defendants are not immune from liability for the foregoing violations of plaintiffs' constitutional rights.

Defendants seek judgment on three claims: unlawful search and seizure under § 1983, false imprisonment and trespass.[3] Furthermore, defendants request the court to find, as a matter of law, that defendants are not liable for punitive damages and enjoy absolute or qualified immunity from suit and thus are not liable for general damages.

The court addresses each motion in turn.

### A. *Plaintiff's Motion for Summary Judgment*

#### 1. Probable Cause

The fourth amendment to the United States Constitution provides that no search

warrants shall issue unless supported by probable cause. U.S. Const. amend. IV.[4] Plaintiffs contend that the Warrant at issue was not supported by probable cause, and thus plaintiffs' were subjected to an unconstitutional search.

In *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the United States Supreme Court set forth the standard for assessing the existence of probable cause.

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.

*Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332 (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). Thus, this court does not conduct a de novo review of Judge Davis' probable cause determination, but instead inquires whether the evidence viewed as a whole provided a substantial basis for Judge Davis' finding of probable cause. *Massachusetts v. Upton*, 466 U.S. 727, 732–33, 104 S.Ct. 2085, 2087–88, 80 L.Ed.2d 721 (1984); *United States v. Harris*, 903 F.2d 770, 774 (10th Cir.1990).

---

**3.** Plaintiffs' Amended Complaint also alleges the following claims for relief: (1) violation of due process rights under 42 U.S.C. § 1983; (2) declaratory and injunctive relief under 42 U.S.C. § 1983; (3) writ of replevin; (4) defamation; (5) tortious interference with business relationship; (6) false arrest; and (7) malicious prosecution. *See* Amended Complaint at 19–28. The court, by order dated May 11, 1989, denied plaintiff's claim for injunctive relief. *See* Order Denying Plaintiff's Motion for Preliminary Injunction (May 11, 1989) at 2.

**4.** The fourth amendment states:

The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not

be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Constitution, amend. IV. The difficulty of interpreting these 54 words to define the permissible reach of the government's arm into our homes and businesses is reflected in the court dockets. Since *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the fourth amendment has been the subject of more litigation than any other provision of the Bill of Rights. *See* 1 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* at ix (2d. ed. 1987).

The items described in the Warrant, and for which the officers were authorized to search, may be categorized as follows: (1) letters, papers, documents, checks or envelopes inscribed or printed upon with the Utah County Constable or Utah County Constable Star; (2) letters, papers, documents, checks or envelopes inscribed or printed upon any such insignia which gives the appearance or represents a government agency, or anything else that in its nature could be used to imply an affiliation with such an agency; (3) any surveillance equipment including electronic listening and recording devices, cameras, binoculars, radios, telephone hardware and records; (4) business records, personnel files, payroll records, computer, both hard and software, contracts, tapes or video equipment.[5]

■ For the Warrant to be supported by probable cause, two conclusions must be supported by substantial evidence—that the items set forth in the Warrant are in fact seizable because of a fair probability they are connected to criminal activity, and that a fair probability exists that the items will be found in the place to be searched. To determine whether these requirements were satisfied with respect to the issuance of the Warrant, the court must examine the probable cause information presented to Judge Davis in light of the items described in the Warrant.

(a) *Letters, papers, documents, checks or envelopes inscribed or printed upon with the Utah County Constable or the Utah County Constable Star*

■ Despite the plain language of this clause, plaintiffs' contend that the language authorizes the search of *all* "letters, papers, documents, checks or envelopes," not just those bearing the Utah County

Constable insignia. Plaintiffs point to the deposition of Officer Witney, whose testimony suggests he believed he was authorized to search and seize *all* letters, papers, documents, checks or envelopes related to SII's business. *See* Deposition of Doug Witney ("Witney Depo.") at 155–64. Thus, plaintiffs claim, because Judge Davis was presented with no information suggesting that *all* letters, papers, documents, checks or envelopes related to or constituted evidence of criminal activity, there was no probable cause to search for these items.

A reasonable reading of Officer Witney's deposition testimony, however, convinces the court that Witney's belief that the Warrant authorized a search for *all* SII business records was based on his reading of the *entire* Warrant, not just the clause describing materials bearing the constable insignia. *See id.* pp. 155, 162, 164–65. In other words, Witney understood the Warrant to authorize search and seizure of materials bearing the constable insignia *and* SII business records.

This interpretation is supported by inclusion of the term "business records," which appears in a separate clause later in the Warrant. Moreover, although the Warrant is no monument to clarity, it is clear that the letters, papers, documents, checks or envelopes referenced in the Warrant are qualified, in the first instance, by the language "inscribed or printed upon with the Utah County Constable [or] the Utah County Constable Star." *See* Warrant at 2.

Thus, the inquiry becomes whether Judge Davis had a substantial basis upon which to conclude that probable cause existed to search for materials bearing the constable insignia. The court concludes that viewing the evidence as a whole, sub-

---

**5.** It should be noted that the Warrant in question is a syntactical and grammatical nightmare. While the court is sympathetic to the difficult task of drafting such warrants with the requisite constitutional particularity, this difficulty only reinforces the need to follow elementary rules of usage and construction. For example, the portion of the Warrant describing the items to be seized consists of a single sentence containing 105 words, no semicolons and ending in an incomplete clause. *See* Warrant at 2. At a minimum, this sentence would have benefitted from a few semicolons to set off the series of clauses. While good grammar alone would not have cured all the Warrant's defects, it may have assisted in three respects: (1) by enabling officers to more easily identify items properly within the scope of the Warrant, (2) by allowing plaintiffs upon service of the Warrant to understand what items officers were authorized to seize, and (3) by assisting the issuing magistrate and this court in determining the breadth of the Warrant.

stantial evidence for such a conclusion did exist. Evidence linking the items to the crimes of forgery and impersonating a police officer was presented in the Affidavit and through sworn testimony before Judge Davis. *See* Affidavit ¶¶ 2–6; *In Re Search Investigations, Inc. and Phillip Naugle,* Transcript of Proceedings before the Hon. Lynn Davis (Fourth Circuit Court of Utah County, Feb. 1, 1989) ("Transcript") pp. 2–4.

Furthermore, Judge Davis heard evidence that the items set forth in the Warrant would be found on the Naugle premises. *See* Affidavit ¶ 6, Transcript at 3–4. Based on this information, Judge Davis had a substantial basis upon which to find there was a fair probability that the items set forth in the Warrant were linked to criminal activity and would be found in the place to be searched. Accordingly, this court concludes that probable cause supported the first descriptive clause of the Warrant—that which describes letters, papers, documents, checks or envelopes bearing the constable insignia.

(b) *Letters, papers, documents, checks or envelopes inscribed or printed upon any such insignia which gives the appearance or represents a government agency, or anything else that in its nature could be used to imply an affiliation with such an agency*

■ Judge Davis was presented with no evidence regarding the existence on the Naugle premises of documents indicating an affiliation with any government agency other than the Utah County Constable's Office. Therefore, plaintiffs argue, no probable causes existed for the search and seizure of materials bearing other types of official insignia or implying an affiliation with other government agencies.

The question here is whether it was permissible for Judge Davis to draw an inference, based on the evidence supporting search of the Utah County Constable materials, that there was probable cause to search for materials bearing other types of official insignia. Here, the court takes guidance from *Gates,* which cautioned that the probable cause determination should be a "practical, common-sense decision" based on the totality of the circumstances. *Gates,* 462 U.S. at 238, 103 S.Ct. at 2332.

Given the probable cause information regarding the Utah County Constable materials, and the fact SII was in the private investigation business, it seems reasonable for Judge Davis to infer that documents bearing other types of official insignia probably existed and probably would be found on the Naugle premises. The court finds that this inference, drawn on the facts presented, was reasonable and permissible, and that based on that inference, Judge Davis had substantial evidence to conclude probable cause existed to search for these materials.

(c) *Surveillance equipment, including electronic listening and recording devices, cameras, binoculars, radios, telephone hardware and records*

■ Evidence of probable cause to search the Naugle premises for surveillance equipment is found in the Affidavit and testimony of Officer Witney before Judge Davis. *See* Affidavit ¶¶ 7–9; Transcript pp. 4–7. This evidence consists of information from individuals who claimed to have conducted illegal wire taps and audio and video surveillance at the direction of plaintiff Phillip Naugle. *See id.* This evidence provides a substantial basis upon which Judge Davis could have concluded there was probable cause to search the Naugle premises for surveillance equipment.

Plaintiffs contend, however, that Judge Davis was provided no evidence *specifically linking* radios or binoculars to criminal activity, and therefore no probable cause existed to search for these items. The language of this clause makes clear, however, that surveillance equipment *includes* radios, binoculars and other equipment used to conduct covert surveillance. Moreover, it seems reasonable to infer, based on the evidence regarding illegal use of electronic listening and recording devices and cameras, that a fair probability existed that other types of surveillance equipment, such as radios and binoculars, would be found on the Naugle premises.

The Warrant's authorization to seize all the Naugle's telephone records is another matter. The court simply can find no substantial evidence in the record supporting Judge Davis' finding of probable cause to seize all such records. Significantly, the reference to telephone records is not limited to particular dates, times, places or phone numbers relevant to the criminal investigation of the Naugles, although the record indicates Officer Witney possessed such information. Absent such limitations, it cannot fairly be said there was a fair probability that *all* the Naugles' telephone records were linked to criminal activity.

In sum, the court finds that substantial evidence supported Judge Davis' probable cause determination with regard to the search of the Naugle premises for surveillance equipment, including radios and binoculars, but that no probable cause existed for the search and seizure of the Naugles' telephone records.

(d) *Business records, personnel files, payroll records, computer, both hard and software, contracts, tapes or video equipment*

Given its plain meaning, this clause authorizes the search and seizure of *all* business records, personnel files, payroll records, computer hardware and software, contracts, tapes and video equipment. Defendants contend, however, that the clause is capable of a narrower construction, and thus construed, is supported by probable cause. Defendants' interpretation relies on two premises—that the business records clause is modified by another clause immediately following it, and that the missing object of this second clause may be ascertained. *See* Defendants' Memorandum in Support of Motion for Summary Judgment ("Defendants' Mem. in Supp.") pp. 17–19.

The court finds no support for either premise. In support of its modification argument, defendants rely on the United States Supreme Court's interpretation of a search warrant in *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). The *Andresen* warrant, however, is not similar grammatically to the language at issue here. In *Andresen*, the Court interpreted the word "crime" in a search warrant to be limited to the crime of false pretenses with respect to a particular piece of real estate. In contrast, the clause at issue here does not refer to any type of crime, transaction, client name, time or event.

As to the second premise, defendants propose various language forms to complete the second clause, which ends, "... any other articles used in the support or furtherance of." Warrant at 2. Defendants contend this clause should be read as "any other articles used in the support or furtherance of *illegal activity of the type specified.*" *See* Defendant's Mem. in Supp. at 18 (emphasis added). At the same time, however, defendants state as an undisputed fact that the clause was intended to mean "any other articles used in the support or furtherance of *plaintiffs' racketeering enterprise and the illegal activities committed by that enterprise to earn money.*" *See* Defendants' Response to Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment ("Defendants' Resp. Mem.") at 4 ¶ 12.

As discussed above, the former interpretation fails because no crimes or illegal activities are specified in the Warrant. The latter interpretation also is deficient because no evidence of a racketeering or criminal enterprise was presented to Judge Davis on the record. Although Witney claims such information was presented to Judge Davis off the record, Utah law requires that "[a]ll evidence to be considered by a magistrate in the issuance of a search warrant shall be given on oath and either reduced to writing or recorded verbatim." Utah Code Ann. § 77–23–4(1) (1990). Thus, this information may not be considered in reviewing whether probable cause existed for this Warrant.

Read most generously, the evidence presented to Judge Davis might have provided a substantial basis for finding probable cause to search and seize (1) computer discs and business files relating to illegal wiretaps, *see* Affidavit ¶ 7; Transcript at 5; (2) personnel and business records relating to Phillip Naugle's involvement in the 1985 Arizona kidnapping, *see* Transcript pp. 8–

10; and (3) business records relating to evidence of tax fraud, *see* Transcript at 12. The clause in question, however, was not limited to evidence of these alleged crimes. Instead, the business records clause authorized officers to seize *all* business records, *all* personnel files, *all* payroll records, *all* computer equipment, *all* contracts, *all* tapes and *all* video equipment.

In sum, the court finds there was no substantial basis upon which to find probable cause to support a search that sweeps as broadly as this clause.

### 2. Particularity

The fourth amendment requires that a search warrant particularly describe the things to be seized. This requirement is a safeguard against a "general, exploratory rummaging in a person's belongings," *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971), and "ensures that the search will be carefully tailored to its justifications." *Maryland v. Garrison,* 480 U.S. 79, 85, 107 S.Ct. 1013, 1017, 94 L.Ed.2d 72 (1987).[6]

■■■ The particularity requirement is satisfied when the description is such that the searcher can reasonably ascertain and identify the things authorized to be seized. *See Garrison,* 480 U.S. at 91, 107 S.Ct. at 1020; *United States v. Leary,* 846 F.2d 592, 602 (10th Cir.1988) ("As an irreducible minimum, a proper warrant must allow the executing officers to distinguish between items that may and may not be seized."). A warrant describing items in broad or generic terms may be valid when the description is as specific as the circumstances and nature of the activity under investigation permit. *Leary,* 846 F.2d at 600. A warrant may be conclusively invalid, however, when it evinces a substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized. *See id.*

■■ The portion of the Warrant most susceptible to challenge for lack of particularity is that portion authorizing seizure of "telephone ... records, business records, personnel files, payroll records, computer, both hard and software, contracts, tapes or video equipment, and any other articles used in the support or furtherance of." Warrant at 2. For reasons stated earlier in the probable cause analysis, the court does not believe the phrase "... any other articles used in the support or furtherance of" modifies the preceding clause or, if it does, that it provides any meaningful limitation on the Warrant.

Unlike the preceding clauses, which specifically identify the items to be seized— *e.g.,* materials bearing Utah County Constable or other official insignia—this portion of the warrant contains no limiting features. It sanctions search and seizure of *all* telephone records, business records, personnel files, payroll records, computer hardware and software, contracts, tapes and video equipment. Such a description was not as specific as the circumstances and the nature of the activity under investigation permitted. For example, the description could have been limited to business records evidencing an involvement in forgery, wiretapping, illegal surveillance,, kidnapping or tax fraud. Furthermore, Officer Witney was aware of the specific clients for whom Phillip Naugle had allegedly conducted wiretaps and of specific types of wiretapping equipment Naugle had used. None of these limiting factors, however, were included in the Warrant.

The insufficient particularity of this portion of the Warrant was demonstrated during the search by the many times officers had to ask Witney and Madsen whether a particular item was within the scope of the Warrant. It seems clear the Warrant did not enable officers to "reasonably ascertain

---

**6.** The particularity requirement reflected the Framers' deeply felt aversion to the general warrant and a long history of general searches in England. The idea that citizens should not be subject to such searches was expressed by William Pitt in language since unsurpassed:

> The poorest man may, in his cottage, bid defiance to all the force of the Crown. It may

be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England may not enter; all his force dares not cross the threshold of the ruined tenement.

N. Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* 49 (1937).

and identify the things authorized to be seized." *Leary,* 846 F.2d at 600. Finally, the insufficient particularity is demonstrated by some of the items actually seized in the search. Defendants do not dispute that more than 220 items not remotely within the scope of the Warrant were seized from the Naugle premises. Included among these items were family picture albums, genealogy records, an odd shaped marble rock, an artificial flower, a cordless weed trimmer charger, soldering iron, tire pressure gauge, putty knife, small screwdrivers and a high school newspaper clipping from 1968.

In sum, the court holds that the portion of the Warrant authorizing the seizure of "telephone ... records, business records, personnel files, payroll records, computer, both hard and software, contracts, tapes or video equipment, and any other articles used in the support or furtherance of" violated the particularity requirement of the fourth amendment and thus subjected plaintiffs to an unconstitutional search.

### 3. Unreasonableness of the Search

■ The record discloses no evidence disputing the fact that officers seized more than 220 items not described in the Warrant. Defendants' mere assertion to the contrary is, of course, insufficient to create a factual issue on this point. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (nonmoving party must designate specific facts showing there is a genuine issue for trial). The court is of the opinion, however, that seizure of these items was not unreasonable, as a matter of law, under the fourth amendment.

Most of the personal items in question were found in a beige filing cabinet and a box containing surveillance equipment on the top. It is true that had officers looked beneath the surveillance equipment they would have discovered the cordless weed trimmer charger and other items not covered in the Warrant. The court cannot conclude, however, that the officers' failure to look renders the entire search unreasonable.

It also is true that a more thorough review of the beige filing cabinet would have revealed that the bulk of the files were personal. However, the beige filing cabinet was located in SII's business office and was organized like the other filing cabinets in which business files had been found. Given these factors and the Warrant's apparent, though unconstitutional, authorization to seize all SII's business records, the officers' decision to seize the entire cabinet for later examination seems reasonable under the circumstances. The alternative seems less reasonable and more intrusive: for officers to have remained on the Naugle premises until each file had been searched—a process that would have taken days. *Cf. United States v. Santarelli,* 778 F.2d 609, 614 (11th Cir.1985) (seizure of filing cabinet for examination outside the home was reasonable where warrant authorized search for particular documents and on-site review would take days).

### 4. Severability

■ In light of the court's holding that part of the Warrant was sufficiently particular and supported by probable cause while part was not, the question becomes whether this renders the entire search unconstitutional or only that portion conducted pursuant to the invalid part of the Warrant. In the criminal context, courts have used the doctrine of severance or partial suppression to sever valid portions of a warrant from invalid portions. Under this doctrine, evidence seized pursuant to the invalid portions of the warrant is suppressed, while items seized under the valid portions is admissible in a criminal prosecution. *See United States v. Christine,* 687 F.2d 749, 754, 758 (3d Cir.1982); 2 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 4.6(f) at 258–59 (2d ed. 1987).

The rationale underlying the severance doctrine is that "[t]he cost of suppressing all the evidence seized, including that seized pursuant to the valid portions of the warrant, is so great that the lesser benefits accruing to the interests served by the Fourth Amendment cannot justify complete suppression." *Christine,* 687 F.2d at 758; *see also* 2 LaFave, § 4.6(f) ("It would be

harsh medicine indeed if a warrant which was issued on probable cause and which did particularly describe certain items were to be invalidated in toto merely because the affiant and the magistrate erred in seeking and permitting a search for other items as well.").[7]

At least seven of the federal circuit courts of appeal have approved the severance doctrine in the criminal context. *See United States v. Fitzgerald* 724 F.2d 633, 636–37 (8th Cir.1983), *cert. denied*, 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 538 (1984); *Sovereign News Co. v. United States*, 690 F.2d 569, 576 (6th Cir.1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83; *United States v. Riggs*, 690 F.2d 298, 301 (1st Cir.1982); *United States v. Christine*, 687 F.2d 749, 758 (3d Cir.1982); *United States v. Cardwell*, 680 F.2d 75, 78 (9th Cir.1982); *United States v. Cook*, 657 F.2d 730, 735 (5th Cir. Unit A. Sept. 1982); *United States v. Jacob*, 657 F.2d 49, 52 (4th Cir.1981), *cert. denied*, 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982).

The Tenth Circuit has considered the applicability of the severance doctrine in two cases, but declined to employ it in each case. *See U.S. v. Leary*, 846 F.2d 592, 606 n. 25 (10th Cir.1988); *Voss v. Bergsgaard*, 774 F.2d 402, 406 (10th Cir.1985). In *Leary*, however, the court expressly left open the question whether severance "may be the appropriate response to an overbroad warrant in this circuit." *Leary*, 846 F.2d at 606 n. 25. This court could find no published decisions applying the severance doctrine in a civil suit. It is the court's opinion, however, that the rationale for severance in the criminal context applies with equal force in a civil action brought under 42 U.S.C. § 1983. It would seem highly anomalous for this court to allow the admission of evidence obtained pursuant to the valid portion of this Warrant in a criminal trial while holding defendants civilly liable for the search and seizure of that same evidence.

The fourth amendment is not applied with zero-sum force in the criminal context, and the court knows no compelling policy reasons why it should be so applied in the civil context. Deterrence of police conduct violative of the fourth amendment, the prime justification for the exclusionary rule, is not undermined by the severance doctrine because evidence seized pursuant to the invalid part of the warrant still is excluded. Similarly, in the civil context, police overreaching is deterred by the liability that may be imposed for that portion of the search conducted pursuant to the unconstitutional part of the warrant.

Application of the severance doctrine is appropriate in this case because the Warrant describes a significant number of items with sufficient particularity. The Warrant's description of documents and other materials bearing the Utah County Constable or other official insignia was sufficiently particular, as was the description of the surveillance equipment to be seized. The search for these items was supported by probable cause. Thus, this case is distinguishable from *Leary*, where "no portion of the ... warrant ... adequately defines the items to be seized." *Leary*, 846 F.2d at 606 n. 25, and *Voss*, where "[t]he bulk of the warrant's provisions simply allow for the seizure of evidence, whether or not related to tax fraud, and largely subsume those provisions that would have been adequate standing alone." *Voss*, 774 F.2d at 406. Furthermore, there is no evidence that defendants framed the Warrant in general terms, then added these particularized, probable cause-supported clauses, in an attempt to engage in a general rummaging of the Naugles' premises.

For the foregoing reasons, the court concludes that severance of the Warrant is proper. Accordingly, the court holds, as a matter of law, that defendants are not liable under 42 U.S.C. § 1983 for that part of the search and seizure conducted pursuant to the valid portions of the Warrant. Thus,

---

**7.** This rationale mirrors the competing public policy concerns that underly the fourth amendment itself. *See* Note, *Warrantless Aerial Surveillance and Florida v. Riley: The Loss of Liberty*, 1990 Utah L.Rev. 407, 408 (fundamental concerns underlying fourth amendment are avoidance of handicapping police capacity to deal with crime and the loss of liberty that accompanies relaxation of restrictions on government).

plaintiffs' motion for summary judgment on the § 1983 claim is denied with respect to that part of the search and seizure. Absent immunity or some other defense, however, defendants are liable for the unconstitutional search and seizure conducted pursuant to the invalid portions of the Warrant.

### 5. Immunity

#### (a) *Absolute Immunity*

■ Plaintiffs seek summary judgment on defendants' affirmative defenses of absolute and qualified immunity. The defense of absolute immunity has potential application only to defendants Allan and Madsen, who are prosecutors in the Utah County Attorney's Office. A prosecutor, however, is only entitled to absolute immunity from suits for civil damages under § 1983 when such suits are predicated upon the prosecutor's performance of functions "intimately associated with the *judicial phase* of the criminal process." *Spielman v. Hildebrand*, 873 F.2d 1377, 1382 (10th Cir.1989) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976)) (emphasis added). The key factor in determining whether the prosecutor is performing such a quasi-judicial function is whether the function is related to advocacy. *See Imbler*, 424 U.S. at 430–31, 96 S.Ct. at 995–96; *Hildebrand*, 873 F.2d at 1382.

In this case, plaintiffs' § 1983 suit is predicated not upon any quasi-judicial functions performed by Madsen and Allan, but rather upon their police-related functions. It is undisputed that Madsen and Allan gave legal advice in reviewing the Affidavit. Both participated in the preliminary gathering of evidence; they accompanied Sheriff's Office deputies to the Naugle residence and advised officers whether particular items should be seized. These functions are not related to advocacy, and thus Madsen and Allan are only entitled to qualified immunity as a matter of law. *Wolfenbarger v. Williams*, 826 F.2d 930, 937 (10th Cir.1987); *Rex v. Teeples*, 753 F.2d 840, 843 (10th Cir.1985), *cert. denied*, 474 U.S. 967, 106 S.Ct. 332, 88 L.Ed.2d 316 (1985).

The defense of qualified immunity is available to all government officials, including police officers, in a § 1983 action alleging violation of fourth amendment rights. *See Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Thus, the court considers as well whether Witney and Quarnberg are immune from liability.

#### (b) *Qualified Immunity*

■ The qualified immunity of defendants Madsen, Allan, Witney and Quarnberg depends on whether they violated clearly established constitutional or statutory rights of which a reasonable person would have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *England v. Hendricks*, 880 F.2d 281, 283 (10th Cir. 1989), *cert. denied*, — U.S. —, 110 S.Ct. 1130, 107 L.Ed.2d 1036 (1990). This question is to be decided by the court after determining "what the current applicable law is and whether that law was clearly established at the time the official's action occurred." *Hendricks*, 880 F.2d at 283–84. "The test of what law is clearly established 'should be determined in a particularized sense' ... [t]his test requires 'some but not precise factual correspondence' between precedent establishing law and the case on review, and demands that defendants apply 'general, well-developed legal principles.'" *DeVargas v. Mason & Hanger–Silas Mason Co., Inc.*, 844 F.2d 714, 724 (10th Cir. 1988) (citations omitted), *appeal after remand*, 911 F.2d 1377, *pet. cert. filed* (U.S. Nov. 5, 1990) (No. 90–720).

■ By February 1 and 2, 1989, the dates the Warrant was issued and executed, the law was clearly established that search warrants must contain limiting features, must be as narrow as the government's knowledge will allow and must not exceed the probable cause information presented to the magistrate. *See Leary*, 846 F.2d at 601–06. In addition, in 1985 the Tenth Circuit had held that a search of all business records is not permissible simply because there is probable cause to believe a business is pervasively criminal.

*See Voss,* 774 F.2d at 406. Moreover, in 1988 the Tenth Circuit had held that a warrant directing officers to seize records relating to violations of the federal export laws was so facially overbroad that the executing officers could not reasonably rely on it. *See Leary,* 846 F.2d at 609.

In this case, the portion of the Warrant authorizing seizure of all SII's telephone records, business records, personnel files, payroll records, contracts and video tapes was not limited by reference to a specific criminal statute or to specific crimes. Thus, this portion of the Warrant was considerably more broad than the *Leary* warrant. In light of *Leary* and *Voss* and the clearly established law, reasonable legal advisors should have known that this portion of the Warrant was facially overbroad and unsupported by probable cause. Consequently, Madsen and Allan are not entitled to qualified immunity for the unconstitutional search conducted pursuant to this portion of the Warrant. Similarly, this portion of the Warrant is so facially deficient that, absent exceptional circumstances, Witney and Quarnberg could not have reasonably relied on it in executing the search.

### (c) *Exceptional Circumstances*

■ Defendants Witney and Quarnberg contend they are entitled to immunity under the exceptional circumstances defense. This defense is an exception to the general rule that a reasonably competent officer should know the clearly established law regarding his or her conduct. The defense requires defendants to prove they were so "prevented" from knowing that their actions were unconstitutional that they "should not be imputed with knowledge of an admittedly clearly established right." *V-1 Oil Company v. State of Wyoming,* 902 F.2d 1482, 1488 (10th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990). The exceptional circumstances defense is rarely applied and its application depends on the facts of each case. *Id.* at 1488.

Mere reliance on the advice of counsel, by itself, is not an extraordinary circumstance justifying immunity. *Id.* at 1489. In some cases, however, such reliance justifies application of the defense. In *V-1 Oil,* the Tenth Circuit found such a case where

an officer relied on the advice of a senior assistant attorney general that a particular statute, which had not been tested in any court, authorized a warrantless search. The circumstances in this case, however, are factually dissimilar from those in *V-1 Oil.*

First, Witney and Quarnberg were not acting, as was the official in *V-1 Oil,* pursuant to a statute that had never been tested in court. Neither was faced with a particularly unique or exceptional circumstance. Second, there is no evidence in the record that Quarnberg requested, obtained or relied on legal advice in connection with the search of the Naugle premises. Third, there is no evidence in the record that Witney relied on the advice he received from Allan and Madsen in drafting the Warrant. Madsen did not review the Warrant; Allan does not recall reviewing it. Indeed, the Affidavit Allan and Madsen approved differs in several respects from the Warrant Witney later requested and obtained. Finally, Witney and Quarnberg were both well-acquainted with, and under a legal duty to know, the relevant legal standard respecting search warrants.

In light of these facts, the court cannot find that Witney and Quarnberg were "prevented" from knowing that their actions were unconstitutional. Rather, the court finds that the unconstitutional portion of the instant Warrant was so facially deficient in its description of the items to be seized that Witney and Quarnberg could not have reasonably relied on it. Consequently, neither Witney nor Quarnberg are entitled to qualified immunity for the search conducted pursuant to that portion of the Warrant.

### 6. Conclusion

In sum, the court holds, as a matter of law, that plaintiffs' fourth amendment rights were violated by that part of the search conducted pursuant to the portion of the Warrant authorizing seizure of "telephone ... records, business records, personnel files, payroll records, computer, both hard and software, contracts, tapes or video equipment, and any other articles

used in the support or furtherance of." The court further holds that defendants Allan, Madsen, Witney and Quarnberg are not entitled to immunity. Accordingly, plaintiffs are entitled to summary judgment on their first and fourth claims for relief for that part of the search. That part of the search conducted pursuant to the remainder of the Warrant was not violative of the fourth amendment, and thus plaintiffs are not entitled to summary judgment on their first and fourth claims for relief for that part of the search.

### B. *Defendants' Motion for Summary Judgment*

Defendants seek summary judgment on the following claims: (1) unlawful search and seizure under 42 U.S.C. § 1983; (2) false imprisonment; (3) trespass; and (4) punitive damages. Additionally, defendants seek summary judgment on the affirmative defenses of absolute or qualified immunity.

### 1. Unlawful Search and Seizure under § 1983

In light of the above holding on plaintiffs' § 1983 and fourth amendment claims and defendants' immunity defenses, it is unnecessary to discuss these claims and defenses any further in relation to the search of the Naugle premises. Defendants are entitled to summary judgment on plaintiffs' first and fourth claims for relief to the extent of the constitutional part of the search—that part conducted pursuant to the valid portions of the Warrant. Defendants are liable to plaintiffs, however, to the extent of the unconstitutional part of the search—that part conducted pursuant to the invalid portions of the Warrant.

The only remaining fourth amendment-related claims upon which defendants seek summary judgment are based upon the stop of Phillip Naugle's vehicle prior to the search, and the alleged detention of Phillip and Cheryl Naugle during the search.

### (a) *The Stop of Phillip Naugle*

█ Plaintiffs' allege that defendants' stop of Phillip Naugle's vehicle on the morning of February 2, 1989 constitutes an unreasonable seizure in violation of the fourth amendment. The stop in question is analogous to the type of stop involved in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). While a *Terry* stop, or investigative detention, is a seizure within the meaning of the fourth amendment, it need not be supported by probable cause. *United States v. Gonzales,* 897 F.2d 504, 506 (10th Cir.1990); *United States v. Espinosa,* 782 F.2d 888, 890 (10th Cir.1986). Such a stop must be justified by an objective manifestation that the person stopped is, or is about to be, engaged in criminal activity. *Gonzales,* 897 F.2d at 506.

Defendants concede that the stop of Naugle was not based on any reasonable relief that he was, or was about to be, engaged in criminal activity. This fact alone, however, does not render the seizure unconstitutional. For the stop to violate the fourth amendment, the seizure of Naugle must be unreasonable. *Michigan Dept. of State Police v. Sitz,* — U.S. —, —, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412 (1990). "Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985).

The court believes that under the circumstances of this stop, common sense and ordinary experience compel the conclusion that the seizure of Naugle was reasonable. Unlike most *Terry* stops, this stop was not initiated to interrogate a suspicious person or search for contraband. Instead, the record indicates defendants planned and initiated the stop to inform Naugle of the Warrant and to request his cooperation in gaining entry to the Naugle property. It seems reasonable that Naugle would want to be informed of the Warrant and be present during the search. Balancing the inconvenience and intrusion of the stop against Naugle's interest in learning of the Warrant and police concerns about entry to the premises, the brief seizure of Naugle seems reasonable. Accordingly, plaintiff is entitled to summary judgment on defendant's § 1983 claim insofar as it relates to the stop of Phillip Naugle.

**(b)** *The Alleged Detention of Phillip and Cheryl Naugle*

■ Whether Phillip and Cheryl Naugle were in fact detained during the search of their premises is disputed by the parties. Assuming, however, that the Naugles were detained, such detention occurred pursuant to the execution of a partially valid warrant to search their premises. The United States Supreme Court has held that it is constitutionally permissible to detain the occupants of a home while officers execute a valid warrant to search that home. *Michigan v. Summers*, 452 U.S. 692, 705, 101 S.Ct. 2587, 2595, 69 L.Ed.2d 340 (1981). Although the Warrant in this case was only partially valid, that validity was sufficient to permit the officers to detain the Naugles. Any detention, therefore, was constitutionally permissible. Accordingly, plaintiffs are entitled to summary judgment on plaintiffs' § 1983 claim insofar as it relates to the detention of the Naugles during the search.

## 2. False Imprisonment and Trespass

■ Plaintiffs seek summary judgment on two of plaintiffs' state law-based claims—false imprisonment and trespass. Because the stop of Phillip Naugle and any detention of Phillip and Cheryl Naugle were, as a matter of law, constitutional, plaintiff's false imprisonment claim fails. Thus, defendants are entitled to summary judgment on this claim.

■ Plaintiffs' trespass claim is barred by the Utah Governmental Immunity Act in the absence of malice or fraud on the part of defendants. Utah Code Ann. § 63–30–4(4) (1989). As discussed below, a genuine issue of material fact exists regarding whether defendants acted with evil motive or malice. This factual dispute precludes summary judgment on the trespass claim.

## 3. Punitive Damages

■ Punitive damages may be awarded in a § 1983 action where "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640,

75 L.Ed.2d 632 (1983); *Melton v. City of Oklahoma City*, 879 F.2d 706, 733 (10th Cir.1989); *Lavicky v. Burnett*, 758 F.2d 468, 477 (10th Cir.1985), *cert. denied*, 474 U.S. 1101, 106 S.Ct. 882, 88 L.Ed.2d 917 (1986). In this case, the record contains evidence that defendants intended to shut down the Naugles' business, disliked Phillip Naugle and seized the Naugles' business license although no information justifying such a seizure was presented to Judge Davis.

Particularly relevant on this point is the deposition testimony of Brent Young, the Naugles' attorney, who recounts a telephone conversation he had with Allan while the search was in progress. Young testified he told Allan, "[I]t sounds to me like you are just trying to put this man out of business. And his [Allan's] response was, and I remember it vividly was, that's correct." Deposition of Brent Young at 19.

Defendants contend plaintiff's have taken this conversation out of context, and that no evidence of evil motive or malice exists. Nevertheless, this evidence is sufficient to raise a material factual dispute as to whether defendants were motivated by an evil intent in searching the Naugle premises. This factual dispute precludes summary judgment on plaintiffs' punitive damages claim.

## 4. Conclusion

Defendants are entitled to summary judgment on plaintiff's first and fourth claims for relief to the extent of the constitutional part of the search of the Naugle premises—that part conducted pursuant to the valid portions of the Warrant. Defendants' motion for summary judgment on these claims is denied as to the unconstitutional part of the search—that part conducted pursuant to the invalid portions of the Warrant. Defendants also are entitled to summary judgment on the first and fourth claims for relief as they relate to the stop of Phillip Naugle and the alleged detention of Phillip and Cheryl Naugle. Finally, defendants are entitled to summary judgment on plaintiffs' claim for false imprisonment. Defendants' motion for sum-

mary judgment on plaintiffs' claims for trespass and punitive damages is denied.

Accordingly, and good cause appearing, IT IS HEREBY ORDERED that

1. Plaintiffs' motion for summary judgment on the first claim for relief (42 U.S.C. § 1983) and fourth claim for relief (fourth amendment) is granted for that part of the search conducted pursuant to the portion of the Warrant authorizing seizure of "telephone ... records, business records, personnel files, payroll records, computer, both hard and software, contracts, tapes or video equipment, and any other articles used in the support or furtherance of."

2. Plaintiffs' motion for summary judgment on the first and fourth claims for relief is denied as to that part of the search conducted pursuant to the remainder of the Warrant.

3. Plaintiffs' motion for summary judgment on the affirmative defenses of absolute and qualified immunity is granted.

4. Defendants' motion for summary judgment on the first and fourth claims for relief is denied for that part of the search conducted pursuant to the portion of the Warrant authorizing seizure of "telephone ... records, business records, personnel files, payroll records, computer, both hard and software, contracts, tapes or video equipment, and any other articles used in the support or furtherance of."

5. Defendants' motion for summary judgment on the first and fourth claims for relief is granted for that part of the search conducted pursuant to the remainder of the Warrant.

6. Defendants' motion for summary judgment on the affirmative defenses of absolute and qualified immunity is denied.

7. Defendants' motion for summary judgment on the first and fourth claims for relief is granted insofar as these claims relate to the stop of Phillip Naugle and the alleged detention of Phillip and Cheryl Naugle.

8. Defendants' motion for summary judgment on the ninth claim for relief (false imprisonment) is granted.

9. Defendants' motion for summary judgment on the eighth claim for relief (trespass) is denied.

10. Defendants' motion for summary judgment on plaintiffs' claim for punitive damages is denied.

11. This Memorandum Decision and Order will suffice as the court's ruling on these motions and no further order need be prepared by counsel.