**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Fikri SOUSSI, Defendant–Appellee.**

No. 93–1038.

United States Court of Appeals,
Tenth Circuit.

July 12, 1994.

James R. Allison, Interim U.S. Atty., Denver, CO, for plaintiff-appellant.

Robert T. McAllister of McAllister & Murphy, P.C., Denver, CO (Barry Boughman of McAllister & Murphy, P.C., with him on the brief) for defendant-appellee.

Before TACHA and EBEL, Circuit Judges, and COOK, District Judge.[1]

EBEL, Circuit Judge.

This is an interlocutory appeal from the district court's suppression order brought pursuant to 18 U.S.C. § 3731. The government contends that the court (1) erroneously amended the search warrant's date restriction; and (2) improperly excluded evidence seized under the plain view doctrine. We conclude that the original date restriction in the search warrant was supported by probable cause and that the court's plain view doctrine analysis was in error. Accordingly, we reverse and remand for further proceedings.

## I. BACKGROUND

This action arose from the government's investigation of Defendant–Appellee Fikri Soussi's ("Soussi") alleged role in the exportation of goods to Libya in violation of 50 U.S.C. §§ 1702 and 1705(b), the International Emergency Economic Powers Act.[2] Soussi is the president and sole shareholder of Oasis International, Inc., an export company incorporated in Colorado and located in Denver ("Oasis Denver").

By affidavit filed on November 21, 1991, United States Customs Senior Special Agent James P. Roth ("Agent Roth") alleged that Soussi engaged in a conspiracy to ship fifty camping trailers from the United States to Libya. Agent Roth's affidavit describes an elaborate scheme involving Oasis Denver and two sister companies—Oasis International, Guernsey, United Kingdom ("Oasis Guernsey") and Oasis International Oilfield, Abu Dhabi, United Arab Emirates ("Oasis Abu

1. Honorable H. Dale Cook, Senior Judge for the United States District Court for the Northern District of Oklahoma, sitting by designation.

2. The International Emergency Economic Powers Act authorizes the President to "deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). Pursuant to this authority, on January 7, 1986, the President issued Executive Order No. 12543 prohibiting, inter alia,

(b) The export to Libya of any goods, technology (including technical data or other information) or services from the United States, except publications and donations of articles intended to relieve human suffering, such as food, clothing, medicine and medical supplies intended strictly for medical purposes;

. . . . .

(h) Any transaction by any United States person which evades or avoids, or has the purpose of evading or avoiding, any of the prohibitions set forth in this Order.

Executive Order No. 12543 (January 7, 1986), *codified in* 31 C.F.R. § 550.101 et seq.

Dhabi"). The scheme purportedly entailed the planned purchase of fifty trailers from a United States manufacturer and the subsequent shipment of these trailers from the United States to LaSpezia, Italy and ultimately to Benghazi, Libya. Three shipping companies were allegedly hired to transport the trailers during various legs of the journey, and Barclay's Bank in Geneva, Switzerland allegedly issued a letter of credit to facilitate the transaction. Agent Roth testified that his information was gathered from a confidential informant as well as from U.S. Customs Agents' discussions with the manufacturer of the trailers and the three shipping companies hired to ship the trailers.

On November 21, 1991, Magistrate Judge Donald E. Abram concluded that Agent Roth's affidavit demonstrated probable cause to support a document search of Oasis Denver's office pursuant to the following warrant:

> *Business records and documents,* including correspondence, telephone messages, facsimile transmittals, purchase orders, invoices, sales records, payment records, contracts, customer information, product information, business contacts, business cards, address books, rolodex cards, and notes; *shipping records,* including orders, receipts, waybills, packing lists, correspondence with freight forwarders and shippers, and insurance documents; *Customs records,* including correspondence, regulations, applications, declarations, reports, and licenses; *telephone records,* including telephone numbers, toll call records, telexes, and facsimile transmittals; *financial records,* including checks, letters of credit, debits, receipts, payment records, bills, and account records; and *similar documents,* whether physical or electronic, *relating to the sale, shipment, or exportation of trailers* or *other goods,* directly or indirectly, *to Libya* during the time period of *August 1, 1990 to the present.*

Order of November 17, 1992 at 3 (emphasis added).

Accordingly, Agent Roth and several other agents executed the search warrant on November 21, 1991. During their five-hour search of Oasis Denver's business office, the agents discovered between ten and fifteen thousand pages of documents, of which they seized approximately three hundred and fifty pages. The warrant did not incorporate Agent Roth's affidavit, but Agent Roth testified at the suppression hearing that he summarized his affidavit for the other agents who participated in the search. Agent Roth made the final decision on site as to which documents to seize.

Following the execution of the warrant, the government obtained a two-count indictment, on February 28, 1992, charging Soussi with conspiracy to export goods to Libya in violation of 18 U.S.C. § 371; and aiding and abetting a transaction involving the export of goods to Libya in violation of 18 U.S.C. § 2 and 50 U.S.C. §§ 1702 & 1705(b). On May 29, 1992, Soussi filed a suppression motion, arguing that the government failed to establish probable cause to support the search warrant and that the warrant was facially overbroad. The district court conducted a suppression hearing on July 2, 1992 and issued an order on November 17, 1992 granting in part, and denying in part, Soussi's motion to suppress.

The court first held that the government had established probable cause to support the search warrant for information relating to the export of fifty trailers to Libya. However, the court also concluded that the government lacked probable cause to search for information relating to the export of unspecified "other goods" because the government offered no information to suggest that Oasis International was illegally exporting any items other than the trailers.

Next, the court ruled that the government lacked probable cause to seize any documents dated prior to July 17, 1991. Whereas the warrant authorized the seizure of documents dating back to August 1, 1990 (nine days prior to the date of Oasis Denver's incorporation), the district court concluded that July 17, 1991 was the proper cutoff date because it was the first date known to the government on which Soussi contacted the manufacturer of the trailers. Thus, the court suppressed all documents dated between August 1, 1990 and July 17, 1991.

Finally, the court rejected the government's reliance on the plain view doctrine to support its seizure of documents relating to "other goods" and those dated prior to July 17, 1991. In this regard, the court reasoned that the government may not "seize an item under the authority of an invalid portion of the warrant and later try to justify the seizure on the ground that the document came into plain view as they executed the warrant." Order of November 17, 1992 at 12. Because the search warrant contained both valid and invalid language, the court invoked the rule of partial suppression and suppressed those items seized under the invalid portion of the warrant.[3]

■ In this appeal, the government challenges the court's treatment of the date restriction and the plain view doctrine analysis. We address these issues in turn.[4]

## II. DISCUSSION

In our review of the court's suppression order, we must accept its factual findings unless clearly erroneous and consider the evidence in the light most favorable to that order. *United States v. Naugle*, 997 F.2d 819, 821–22 (10th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). However, we review de novo the court's determinations of law, such as the "severability of the warrant and the permissible scope of the search." *Id.* at 822.

### A. Date Restriction

The government first contends that it had probable cause to seize documents dating back to August 1, 1990 because it believed that Soussi was engaged in a complex international business transaction involving multiple parties that necessarily preceded July 17, 1991, which was the date that the court concluded was the first time that Soussi contacted the manufacturer of the trailers.[5] In rejecting the government's argument, the district court stated that any date earlier than July 17, 1991 would be arbitrary.

The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV; *United States v. Mesa–Rincon*, 911 F.2d 1433, 1436 (10th Cir.1990). The Supreme Court has stated that "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983).

> The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id.* at 238, 103 S.Ct. at 2332.

■ A reviewing court must give "great deference" to the magistrate's determination of probable cause and should uphold that conclusion if the "totality of the information

---

3. Although at the time of the district court's suppression hearing we had not expressly adopted the rule that valid portions of a warrant may be severed from invalid portions, we have since done so in *United States v. Brown*, 984 F.2d 1074, 1077–78 (10th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 204, 126 L.Ed.2d 161 (1993). More recently, in *United States v. Naugle*, 997 F.2d 819, 822 (10th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993), we limited somewhat the severability concept to allow it only when at least a substantial part of the warrant is valid.

4. Because we conclude that the district court did not err in ruling that the search warrant did not constitute a general warrant, we reject Soussi's argument that the court's suppression order may be affirmed on the ground that the warrant authorized a general search. Nor do we agree with Soussi's allegation that the government's failure to include additional information in the warrant "invalidates the general description in the warrant." Even if the government possessed information that could have rendered the warrant more particular, it in no way undermines the court's conclusion that the warrant, as is, was sufficiently particular with respect to documents relating to the alleged export of the trailers.

5. The court appears to have misread the affidavit. In fact, Agent Roth's affidavit indicates that the earliest known date on which Soussi contacted the trailer manufacturer was May 1991.

contained in the affidavit provided a substantial basis for finding there was a fair probability that evidence of criminal activity would be found at" Oasis Denver's office. *United States v. Hager*, 969 F.2d 883, 887 (10th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 437, 121 L.Ed.2d 357 (1992). The affiant's experience and expertise may be considered in the magistrate judge's calculus, *United States v. Wicks*, 995 F.2d 964, 972 (10th Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 482, 126 L.Ed.2d 433 (1993), which, in Agent Roth's case, consisted of four years as a special agent for the U.S. Customs Service, training in the enforcement of export laws, participation in numerous export violation investigations, and assignment to Operation Exodus, a program directed toward the investigation of unlawful exports.

■ We determine whether a search warrant's date restriction is supported by probable cause by examining the nature of the alleged illegal activity. *Matter of Search of Kitty's East*, 905 F.2d 1367, 1374–75 (10th Cir.1990). There, the magistrate concluded that federal agents had probable cause to believe that thirteen business entities were engaging in a conspiracy to transport and sell obscene materials and to launder money. Although the government's investigation that gave rise to this probable cause occurred in 1988, we upheld a starting date restriction of 1983, which the government requested because of the five-year statute of limitations in the federal statutes that the defendants' allegedly violated. *Id.* at 1375. We deemed this five-year date restriction reasonable under the particular facts of that case because of the nature of the ongoing pornographic activity of the related entities. *Id.* at 1374; *see also United States v. Slocum*, 708 F.2d 587, 603 (11th Cir.1983) ("[I]f the fraud operation under investigation was ongoing, evidence of illegal activity in the past would be relevant to the conspiracy, while records of legitimate transactions prior to the conspiracy will help determine how and when the fraud scheme began.") (quoting *United States v. Zanche*, 541 F.Supp. 207, 210 (W.D.N.Y.1982)).

In *Slocum*, the court held that the officers acted reasonably under an open-ended warrant in examining documents dated nearly two years prior to the earliest known date of a transaction relating to the conspiracy. As the Supreme Court explained in *Andresen v. Maryland*, 427 U.S. 463, 480 n. 10, 96 S.Ct. 2737, 2741 n. 10, 49 L.Ed.2d 627 (1976), "[u]nder investigation was a complex real estate scheme whose existence could be proved only by piecing together many bits of evidence. Like a jigsaw puzzle, the whole 'picture' of ... [the] scheme ... could be shown only by placing in the proper place the many pieces of evidence that, taken singly, would show comparatively little."

■ Agent Roth's investigation in the instant case led to the discovery of an alleged international conspiracy between Oasis Denver and two foreign corporations, and involving three shipping and freight forwarding corporations and a Swiss bank. Agent Roth's affidavit could not identify the precise date on which the alleged conspiracy commenced. Nonetheless, the nature of the alleged criminal activity required extensive planning and preparation, all carried out secretly. We conclude that documents dated during the ten months prior to the date Soussi first contacted the trailer manufacturer could reasonably provide a "substantial basis" under *Gates* for concluding that a crime had occurred as alleged. *See Warden v. Hayden*, 387 U.S. 294, 307, 87 S.Ct. 1642, 1650, 18 L.Ed.2d 782 (1967) (in scrutinizing a warrant authorizing the seizure of evidence, "probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction").

Accordingly, we reverse the district court's amendment to the date restriction in the search warrant and uphold, as supported by probable cause, the original date restriction of August 1, 1990.

### B. Plain View

■ The government next appeals the district court's rejection of its attempt to invoke the plain view doctrine to justify the seizure of documents relating to the export of trailers dated between August 1, 1990 and July 17, 1991, as well all documents not directly related to the exportation of trailers (i.e. the

documents relating to unspecified "other goods"). However, since we have upheld the earlier date of August 1, 1990 as it appears in the warrant, the plain view doctrine is not needed to justify seizure of documents relating to the trailers going back to August 1, 1990. We therefore undertake the plain view doctrine analysis only for seized documents applying to the export of "other goods"[6] and any documents applying to the export of the trailers that may be dated prior to August 1, 1990. The district court concluded that the plain view exception to the warrant requirement does not allow for admission of such documents because plain view "may not be used to provide a secondary backup justification for items seized pursuant to an invalid part of the warrant." Order of November 17, 1992 at 13.

We are mindful of the "grave dangers [to privacy interests] inherent in executing a warrant authorizing a search and seizure of a person's papers ... [insofar as] some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized." *Andresen,* 427 U.S. at 482 n. 11, 96 S.Ct. at 2749 n. 11. Furthermore, " 'the plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." *Coolidge v. New Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 2026, 29 L.Ed.2d 564 (1971) (plurality opinion).

Accordingly, to prevent the plain view doctrine from eviscerating Fourth Amendment protections, the courts have required the government to satisfy a three-prong test: (1) the officer was lawfully in a position from which to view the object seized in plain view; (2) the object's incriminating character was immediately apparent—i.e. the officer had probable cause to believe the object was contraband or evidence of a crime; and (3) the officer had a lawful right of access to the object itself. *Horton v. California,* 496 U.S. 128, 136–37, 110 S.Ct. 2301, 2307–08, 110

L.Ed.2d 112 (1990); *United States v. Dixon,* 1 F.3d 1080, 1084 (10th Cir.1993).

Along with numerous other circuits, we have upheld the plain view seizure of documents even when the police only learned of the documents' incriminating nature by perusing them during a lawful search for other objects. *See, e.g., United States v. Gentry,* 642 F.2d 385, 387 (10th Cir.1981) (upholding plain view seizure of documents relating to the manufacture of methamphetamine sulfate in the course of a lawful search for drugs); *United States v. Barnes,* 909 F.2d 1059, 1070 (7th Cir.1990) (given the immediately apparent incriminating nature of the contents of a spiral notebook found in plain view, the officers were justified in seizing it during the execution of a warrant to seize cocaine because the cocaine could have been stored in the notebook); *Crouch et al. v. United States,* 454 U.S. 952, 955, 102 S.Ct. 491, 492, 70 L.Ed.2d 259 (1981) (White, J., dissenting from denial of petition for writ of certiorari) (citing opinions from the Second, Sixth, Eighth, and Ninth Circuits where a plain-view seizure of documents was upheld even though the incriminating nature of the documents was not apparent until they were read).

Here, the district court rejected the government's reliance on the plain view doctrine without considering whether the government met the three-prong test under *Horton.* In so doing, the court added a new gloss to the plain view test—namely, that the officer may not use the plain view doctrine to justify a seizure of items that were initially seized pursuant to an unconstitutional portion of an otherwise valid warrant. We are sympathetic to the court's concern, and the admonition by the *Coolidge* plurality, that the plain view doctrine not be used to sanction a general search. However, the Supreme Court's three-prong test adequately prevents such an occurrence by specifying the only circumstances in which the plain view doctrine applies.

---

**6.** The government did not appeal the district court's order restricting the warrant to the fifty trailers that were to be exported to Libya and excluding from the warrant the reference to "other goods." Thus, in order to justify the seizure of *any* documents relating to "other goods" that may be exported to Libya, regardless of their date, the government must rely on the plain view doctrine.

The district court justified its rule as protecting the Fourth Amendment's particularity requirement and deterring general searches. The Fourth Amendment's "prohibition against general searches and general warrants serves primarily as a protection against unjustified intrusions on privacy." *Horton,* 496 U.S. at 141, 110 S.Ct. at 2310. However, "[i]f an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy." *Id.* at 133, 110 S.Ct. at 2306. The Court in *Horton* elaborated upon why the plain view doctrine does not undermine the Fourth Amendment's particularity requirement:

> The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement. If the officer has knowledge approaching certainty that the item will be found, we see no reason why he or she would deliberately omit a particular description of the item to be seized from the application for a search warrant. Specification of the additional item could only permit the officer to expand the scope of the search. On the other hand, if he or she has a valid warrant to search for one item and merely a suspicion concerning the second, whether or not it amounts to probable cause, we fail to see why that suspicion should immunize the second item from seizure if it is found during a lawful search for the first.

*Id.* at 138–39, 110 S.Ct. at 2308–09.

We see no principled rationale to amend this firmly established test so as to insulate from seizure clearly incriminating items found in plain view during a lawful search for other materials merely because such items were named explicitly in an invalid portion of a warrant. Given that the plain view doctrine permits the government to seize items that are *not* named in an invalid portion of a warrant—so long as the officer has not violated the Fourth Amendment in arriving at the site, the incriminating nature of the material was immediately apparent, and the search was confined to the area authorized by the valid portion of a warrant—the district court's new restriction infuses an unwarranted restriction that is not supported by the principles that inform Fourth Amendment jurisprudence.

Indeed, three circuits have expressly stated that even if part of a warrant is invalid, the police may properly seize evidence in plain view that is listed in the invalid portion of the warrant, provided that the redacted warrant justifies police presence on the site. *United States v. George,* 975 F.2d 72, 79 (2d Cir.1992) (explaining that "a redacted warrant may justify a police intrusion, satisfying in this fashion this crucial element of the plain view doctrine"); *United States v. Holzman,* 871 F.2d 1496, 1513 (9th Cir.1989) ("[D]espite the lack of probable cause to support the warranted search for bonds, the seizure of the bonds could be justified under the doctrine of 'plain view.' "); *United States v. Fitzgerald,* 724 F.2d 633, 637 (8th Cir. 1983) (en banc) ("[T]he infirmity of part of a warrant requires the suppression of evidence seized pursuant to that part of the warrant (*assuming such evidence could not otherwise have been seized, as for example on plainview grounds during the execution of the valid portions of the warrant*)...."") (emphasis added), *cert. denied,* 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 538 (1984). Neither the district court in the instant case, nor Soussi, cite any authority to the contrary.

We implicitly accepted this rule in *United States v. Brown,* 984 F.2d 1074, 1078 (10th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 204, 126 L.Ed.2d 161 (1993), where we cited with approval both *Holzman* and *George.* In *Brown,* the officers executed a state search warrant to seize a microwave oven, a cedar chest, and "any other item" that they knew or had reason to believe was stolen. We stated that although the authorization to search for "any other item" was impermissibly overbroad, the valid portion of the warrant—to search for the oven and the chest—authorized the officers' presence at the site. While at the site, the officers smelled methamphetamine and discovered a methamphetamine laboratory, drug paraphernalia, and a substance they suspected was methamphetamine. Based on this information, a subse-

quent federal search warrant was obtained to seize the methamphetamine and drug paraphernalia. We upheld the subsequent warrant in the face of the defendant's contention that evidence seized under this subsequent warrant was fruit of the illegal prior warrant. *Brown*, 984 F.2d at 1078.

Today, we make explicit that which *Brown* presaged: items named in an impermissibly broad portion of a warrant may nevertheless be seized pursuant to the plain view doctrine so long as the government's plain view seizure scrupulously adheres to the three-prong *Horton* test. Although the officers in *Brown* opted to obtain a new warrant authorizing the seizure of the contraband, satisfaction of the *Horton* test would have justified a warrantless seizure of the items under the plain view doctrine. *See United States v. Naugle*, 997 F.2d 819, 822 (10th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993) (applying severability doctrine to partially valid warrant and upholding a plain view seizure conducted while executing the valid portion of the warrant). That case differs from the instant one only because the evidence observed in plain view was not described in the invalid portion of the search warrant.

In the instant case, Agent Roth and the other U.S. Customs agents were lawfully on the premises of Oasis Denver's office by virtue of the valid portion of the warrant authorizing the seizure of information relating to the alleged exportation of trailers to Libya. *Naugle*, 997 F.2d at 822. Thus, the first prong of *Horton* is satisfied. The agents also satisfied the third prong of *Horton* because they had a lawful right of access to examine, at least cursorily, all the documents found in Oasis Denver's office to determine whether they were relevant to the alleged conspiracy. Order of November 17, 1992 at 17 (ruling that "the search was consistent with *Andresen* [427 U.S. at 482 n. 11, 96 S.Ct. at 2749] in that it was executed so as to minimize the intrusion on defendant's rights").

What remains to be determined, however, is whether the government can satisfy the second prong of *Horton:* was the incriminating character of the documents seized under the plain view doctrine immediately apparent during the cursory review (i.e. did the agents have probable cause to believe that the items were evidence of a crime or illegal contraband, *Arizona v. Hicks*, 480 U.S. 321, 326, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987))? Because this is a factual determination to be addressed in the first instance by the district court, we remand. *United States v. Jenkins*, 876 F.2d 1085, 1088 (2d Cir.1989).

### III. CONCLUSION

We REVERSE the district court's suppression order and REMAND for further proceedings.